1  Melinda Bird, State Bar No. 102236
   melinda.bird@disabilityrightsca.org
2  Jeanie Min, State Bar No. 323043
   jeanie.min@disabilityrightsca.org
3  Emily Ikuta, State Bar No. 315568
   emily.ikuta@disabilityrightsca.org
4  DISABILITY RIGHTS CALIFORNIA
   350 S. Bixel Street, Suite 290
5  Los Angeles, CA 90017
   Tel.: (213) 213-8000
6  Fax: (213) 213-8001

7  Rebecca Williford, State Bar No. 269977
   rwilliford@dralegal.org
8  Meredith J. Weaver, State Bar No. 299328
   mweaver@dralegal.org
9  Elizabeth Ballart, State Bar No. 299226
   eballart@dralegal.org
10 DISABILITY RIGHTS ADVOCATES
   2001 Center Street, 4th Floor
11 Berkeley, CA 94704
   Tel: (510) 665-8644
12 Fax: (510) 665-8511

13 *Attorneys for Plaintiffs*

14 (List of Plaintiffs' Counsel continued on next page)

15            **UNITED STATES DISTRICT COURT**

16           **NORTHERN DISTRICT OF CALIFORNIA**

17              **SAN FRANCISCO DIVISION**

18 LUGENE McCULLOUGH, by and through
   his guardian ad litem Maya Klein; GINA
19 LAMBERTON, by and through her guardian      **CLASS ACTION**
   ad litem Jeffrey Taylor; JOSONIA BISHARA,
20 by and through her guardian ad litem Samond  **COMPLAINT FOR INJUNCTIVE AND**
   Bishara on behalf of themselves and all others **DECLARATORY RELIEF**
21 similarly situated;

22          Plaintiffs,

23 v.

24 CALIFORNIA DEPARTMENT OF
   DEVELOPMENTAL SERVICES; and
25 NANCY BARGMANN, in her official
   capacity as Director of the California
26 Department of Developmental Services,

27          Defendants.

28

William Leiner, State Bar No. 255528
william.leiner@disabilityrightsca.org
DISABILITY RIGHTS CALIFORNIA
1330 Broadway, Suite 500
Oakland, CA 94612
Tel.: (510) 267-1200
Fax: (510) 267-1201

*Attorneys for Plaintiffs*

# INTRODUCTION

1.      Defendants California Department of Developmental Services ("DDS") and its director administer a statewide program of services for Californians with intellectual and developmental disabilities ("I/DD") but have failed to ensure that the thousands of deaf individuals who qualify for these services—including Plaintiffs—receive equal access thereto, in direct violation of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132 *et seq.*; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a); and California Government Code § 11135.

2.      Plaintiffs and thousands of others similarly situated are systematically denied interpreters and other aids and services that are necessary for effective communication and are also denied access to appropriate habilitative services. Plaintiffs and others like them are thus subjected to discrimination and are denied the benefits of DDS's program that are available to hearing people with I/DD. They are isolated from social interaction and denied the opportunity to develop important life skills.

3.      DDS administers an extensive system of services for people with I/DD mandated by the Lanterman Developmental Disabilities Services Act ("Lanterman Act"), California Welfare & Institutions Code § 4500 *et. seq*. DDS contracts with a system of twenty-one regional centers to deliver I/DD programs and services using DDS funds and under DDS's direction. However, DDS has failed to adopt policies and issue directives to ensure that the I/DD services it funds and oversees are accessible to people who are deaf. DDS does not require regional centers to properly assess the communication needs of their deaf clients or provide interpreters or programs with signing staff, nor has it provided sufficient funding for programs to do so.

4.      The impact of DDS's failures on Plaintiffs has been devastating. Despite receiving I/DD services from the same contracted regional center, Plaintiffs Gina Lamberton and Josonia Bishara, both of whom are deaf and communicate using American Sign Language ("ASL"), were placed in separate group homes and day programs with no signing staff or peers and no interpreters. Plaintiff Lugene McCullough, who is deaf and communicates using ASL

---

signs and visual-gestural communication, also lives in a group home and attends a day program without signing staff or peers and without any interpreters. Without the ability to communicate with anyone in their homes or day programs, Plaintiffs have lived in isolation for many years (decades in Mr. McCullough's case), unable to socialize, express concerns, or share how they are feeling. They are lonely and desperately want to have someone with whom they can communicate. DDS's I/DD service providers are supposed to offer choices to consumers[1], address their emotional and behavioral needs, and teach them life skills and safety procedures, but Plaintiffs are denied the benefit of these services and subjected to constant, ongoing discrimination.

5.    Plaintiffs' experiences are unfortunately all too common. DDS's I/DD program likely includes more than 5,000 consumers who are deaf. Many communicate via ASL or other sign languages with varying degrees of fluency. Others communicate using gestures, visual-pictorial systems, and visual cues. These deaf individuals may also use or benefit from assistive technology to facilitate communication with hearing individuals. DDS and its contractors have ignored their obvious need for assistance with communication and systemically fail to identify, assess, and accommodate their communication needs.

## **JURISDICTION**

6.    This is an action for declaratory and injunctive relief to enforce Plaintiffs' rights under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.*, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a), and California Government Code § 11135.

7.    This Court has jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. §§ 1331 and 1343, and supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

8.    This Court has jurisdiction to issue declaratory and injunctive relief under 28 U.S.C. §§ 2201–2202, and 42 U.S.C. § 1983.

---

[1] "Consumer" refers to an individual who has been found eligible to receive I/DD services pursuant to the Lanterman Act. See Cal. Welf. & Inst. Code § 4512(a) (defining developmental disability under the Act) & § 4512(d) (defining "consumer" as a person who meets the definition of developmental disability under subdivision (a)).

1

**VENUE AND INTRADISTRICT ASSIGNMENT**

2    9.    Venue is proper in the Northern District of California because Plaintiff

3  McCullough resides within this District, Defendants operate and perform official duties in this

4  District, and a substantial part of the events, acts, and omissions giving rise to the claims

5  occurred in the Northern District of California.

6    10.    Because Plaintiff McCullough resides in Marin County and a substantial part of

7  the events, acts, and omissions giving rise to the claims occurred in Marin County, this case

8  should be assigned to the San Francisco Division or the Oakland Division of this Court

9  pursuant to Local Rule 3-2(d).

10

**PARTIES**

11    11.    Plaintiff Lugene McCullough has profound hearing loss and an intellectual and/or

12  developmental disability. He is eligible for and receives services administered and funded by

13  Defendant DDS through Golden Gate Regional Center. He is a "qualified individual with a

14  disability" and a person with a "disability" within the meaning of all applicable statutes and

15  regulations, including 42 U.S.C. § 12131(2), 28 C.F.R. § 35.104, and 29 U.S.C. § 705(20). He

16  lives in a group home in Novato, California. He is represented in this action by his proposed

17  *guardian ad litem*, Maya Klein.[2]

18    12.    Plaintiff Gina Lamberton is deaf and has an intellectual and/or developmental

19  disability. She is eligible for and receives services administered and funded by Defendant DDS

20  through Inland Regional Center. She is a "qualified individual with a disability" and a person

21  with a "disability" within the meaning of all applicable statutes and regulations, including 42

22  U.S.C. § 12131(2), 28 C.F.R. § 35.104, and 29 U.S.C. § 705(20). She lives in a group home in

23  Moreno Valley, California. She is represented in this action by her proposed *guardian ad litem*,

24  Jeffrey Taylor.

25    13.    Plaintiff Josonia Bishara is deaf and has an intellectual and/or developmental

26  disability. She is eligible for and receives services administered and funded by Defendant DDS

27

28

---

[2] An ex parte application to appoint all *guardians ad litem* is filed herewith.

through Inland Regional Center. She is a "qualified individual with a disability" and a person with a "disability" within the meaning of all applicable statutes and regulations, including 42 U.S.C. § 12131(2), 28 C.F.R. § 35.104, and 29 U.S.C. § 705(20). She lives in a group home in San Jacinto, California. She is represented in this action by her proposed *guardian ad litem*, Samond Bishara.

14.     Defendant DDS is a state agency that operates and administers California's I/DD services system, which includes community-based services for Californians with I/DD provided by local regional centers, and services in developmental centers operated by DDS directly.

15.     At all relevant times, DDS has been a public entity within the meaning of Title II of the ADA, 42 U.S.C. § 12131(1); has received federal financial assistance within the meaning of the Rehabilitation Act, 29 U.S.C. § 794; and has had more than fifty employees.

16.     Defendant Nancy Bargmann is DDS's current Director and is sued only in her official capacity. Director Bargmann is responsible for directing, organizing, and administering DDS's programs and contractual arrangements. She has the responsibility to ensure DDS's compliance with federal and state laws.

## CLASS ACTION ALLEGATIONS

17.     Plaintiffs bring this action as a statewide class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(2) on behalf of:

> Individuals who, now or in the future, are deaf and are eligible or become eligible for DDS's I/DD services pursuant to the Lanterman Developmental Disabilities Services Act ("the Class").

18.     The Class is so numerous that joinder of all persons is impracticable. According to DDS data, approximately 5,000 DDS consumers statewide have severe hearing loss.[3]

19.     Individual action by class members is impracticable. Class members face significant barriers to asserting their rights because of their I/DD. Most are also indigent, which is another obstacle to their ability to bring individual actions.

---

[3] Cal. Dep't of Developmental Servs., Quarterly Consumer Characteristics Report Index for the end of March 2020, Table 03 (Apr. 9, 2020), *available at* https://www.dds.ca.gov/transparency/facts-stats/quarterly-client-characteristics-reports.

20.    Plaintiffs' and class members' claims raise common questions of fact including, but not limited to:

a.    whether Defendants have implemented system-wide processes for ensuring that deaf consumers have effective communication, including but not limited to: assessment of their communication needs, identification of their preferred and effective means of communication, provision of appropriate auxiliary aids and services, and informing deaf consumers of their right to effective communication and the process for obtaining effective communication;

b.    whether Defendants deny equal access to the benefits of I/DD services to deaf consumers as compared to hearing consumers;

c.    whether Defendants have implemented system-wide processes for ensuring that class members are provided with the reasonable modifications they require to benefit from I/DD services; and

d.    whether Defendants have provided notice regarding consumers' rights under the ADA, designated an ADA coordinator, and established a grievance system for ADA complaints.

21.    Plaintiffs' and class members' claims raise common questions of law including, but not limited to:

a.    whether Defendants' failure to ensure effective communication violates Title II of the ADA, Section 504 of the Rehabilitation Act of 1973, and state anti-discrimination law; and

b.    whether Defendants administer the I/DD system in a manner that discriminates against class members in violation of Title II of the ADA, Section 504 of the Rehabilitation Act of 1973, and state anti-discrimination law.

22.    Plaintiffs' claims are typical of class members' claims. Each individual Plaintiff and class member is deaf, resides in California, and is eligible for I/DD services administered

by Defendants. All require accommodations to benefit from the services provided by Defendants and to achieve effective communication through access to auxiliary aids and services.

23.     Plaintiffs are adequate representatives of the Class because they suffer from the same deprivations as the other class members and have been denied the same rights that they seek to enforce on behalf of the Class.

24.     Plaintiffs will fairly and adequately represent the interests of the absent class members.

25.     Plaintiffs' interests in obtaining injunctive relief for the violations of their rights and privileges are consistent with and not antagonistic to those of any person within the Class.

26.     Plaintiffs' counsel is qualified, experienced, and able to conduct the proposed litigation.

27.     Prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudication with respect to individual class members, which would establish incompatible standards of conduct for DDS or could be dispositive of the interests of the other members or substantially impair or impede the ability to protect their interests.

28.     A class action is superior to other available methods for the fair and efficient adjudication of the controversy. A multiplicity of suits with consequent burden on the courts and Defendants should be avoided. It would be virtually impossible for all class members to intervene as parties in this action.

29.     Defendants have acted or refused to act, and continue to act or refuse to act, on grounds applicable to the Class, thereby making appropriate final injunctive and declaratory relief with respect to the Class as a whole.

## **FACTUAL ALLEGATIONS APPLICABLE TO THE CLASS**

### ***DDS's I/DD Services Program***

30.     California created and funds an extensive, state-wide program to provide services and supports to people with I/DD (hereinafter, "I/DD services program"). California Lanterman Act, Cal. Welf. & Inst. Code §§ 4500–4885.

31.     The purpose of the I/DD services program is to "enable persons with developmental disabilities to approximate the pattern of everyday living available to people without disabilities of the same age." Cal. Welf. & Inst. Code § 4501.

32.     Defendant DDS is the state agency responsible for administration of the I/DD services program. *Id.* §§ 4434, 4629, 4635.

33.     DDS contracts with twenty-one private nonprofit corporations called "regional centers" to provide services to people with I/DD under the I/DD services program.

34.     DDS is responsible for overseeing the conduct of regional centers and ensuring that they operate in compliance with federal and state law and regulation. To that end, the state legislature has empowered DDS to "take all necessary actions" to maintain such oversight. *Id.* § 4434(a)–(c).

35.     DDS may be required to provide services or supports directly where there are identified gaps in the system of services or where there are identified consumers for whom no provider is available to provide the necessary services. *Id.* § 4648(g).

36.     Individuals are eligible to participate in DDS's I/DD services program if they have an intellectual disability or developmental disability that originates before age 18, and which is substantially disabling for the person. *Id.* §§ 4501, 4512(a).

37.     Each consumer has an individual program plan ("IPP") that identifies goals, objectives, services, and supports and must be centered on the consumer's needs and preferences. *Id.* § 4646(a), (d).

38.     Communication is central to the person-centered planning process used to establish IPPs for consumers. Consumers must have an "opportunity to actively participate in the development of the plan." *Id.* § 4646(b).

39.     An individual's IPP must be revised on a regular basis at a meeting attended by regional center representatives, service providers, the consumer, and others in the consumer's circle of support. *Id.* § 4646.5(b). IPP meetings can be complicated and lengthy and involve future planning, goal setting, and decision-making on the part of the consumer.

40.    Consumers are entitled to services and supports to alleviate a developmental disability; promote social, personal, physical, or economic habilitation or rehabilitation; or assist in the achievement and maintenance of independent and productive lives.

41.    I/DD services and supports may include supported employment; assessments; behavior training and behavior modification; community support; daily living skills training; facilitating circles of support; habilitation; paid roommates or neighbors; social skills training; supported living arrangements; technical and financial assistance; speech, physical, and occupational therapy; and travel training.

42.    I/DD services also include placement in a community care facility, commonly known as a group home, for those who choose this living arrangement.

43.    DDS's I/DD services are intended to enable people with I/DD to "make choices in their own lives, including, but not limited to, where and with whom they live, their relationships with people in the community, the way they spend their time, including education, employment, and leisure, the pursuit of their personal future, and program planning and implementation." Cal. Welf. & Inst. Code § 4502(b)(10).

44.    DDS funds I/DD services aimed at "social, personal, physical, or economic habilitation" and "the achievement and maintenance of independent, productive, and normal lives." *Id.* § 4512(b). These include habilitation services to address job readiness, including the "ability to communicate basic needs and understand basic receptive language." *Id.* § 4853(b)(4).

45.    DDS requires regional centers to collect data on each consumer, including their primary language and degree of hearing loss, and report this through the Client Development Evaluation Report ("CDER"). According to CDER, at the end of March 2020 almost 5,000 DDS consumers had severe hearing loss.

46.    The CDER database identifies approximately 550 adult consumers with hearing loss whose language is ASL or another sign language. This CDER data likely underrepresents the actual number of consumers who communicate using ASL or another sign language because regional centers have not conducted appropriate communication assessments of deaf consumers

to determine their preferred mode of communication and often list the language of the consumer's family or caregiver instead.

### *Communication with Deaf Individuals with I/DD*

47.    Individuals who are deaf may use various methods of communication including sign language, visual-gestural communication, visual-pictorial systems, and spoken/written language.

48.    The most common form of sign language in the United States is American Sign Language ("ASL").

49.    ASL is a language comprised of hand motions, facial expressions, eye gazes, and body postures with its own unique syntax and grammar that is unrelated to and not derived from English.

50.    Many deaf consumers have communication barriers as a result of their I/DD or lack of ASL instruction and need a Certified Deaf Interpreter ("CDI")[4] to communicate effectively.

51.    Studies have found that deaf individuals with no cognitive impairment have, on average, only a fourth-grade median reading level in English.[5] Other studies have found that the English literacy skills of adults with intellectual disabilities are far lower than those of hearing individuals with similar intellectual disabilities.[6] Using written English to communicate with deaf individuals with I/DD is generally less effective than with other deaf individuals or with

---

[4] A Certified Deaf Interpreter is deaf or hard of hearing and has met the requirements for a certificate from the Registry of Interpreters for the Deaf, Inc. These requirements include familiarity with Deaf culture, native or near-native fluency in ASL and specialized training in the use of gesture, mime, props, drawings, and other tools to enhance communication. The use of the upper-case "D" in "Deaf" refers to people who share a language—ASL—and who identify as culturally Deaf. Often, Deaf people were born deaf and ASL is their first language.

[5] Judith A. Holt et al., *Interpreting the Scores: A User's Guide to the 9th Edition Stanford Achievement Test for Educators of Deaf and Hard-of-Hearing Students*, GALLAUDET RES. INST. TECHNICAL REPORT 97-1 (1997); GALLAUDET RES. INST., STANFORD ACHIEVEMENT TEST, FORM S, NORMS BOOKLET FOR DEAF AND HARD-OF-HEARING STUDENTS, 9th ed. (1996).

[6] Ludo Verhoeven & A. Vermeer, *Literacy Achievement of Children with Intellectual Disabilities from Diverse Linguistic Backgrounds*, 50 J. OF INTELL. DISABILITY RES. 725 (2006); Ludo Verhoeven & A. Vermeer, *Sociocultural Variation in Literacy Achievement*, 54 BRIT. J. OF EDUC. STUD. 189 (2006).

1    other individuals with I/DD.

2        52.    Multiple national studies of programs for people with I/DD found that improving

3    communication skills lowers the need for high staffing ratios and reduces the cost that states

4    pay for community-based residential care.[7]

5        53.    Deaf individuals who use sign language or other gestural communication may use

6    videophones for communication as hearing people use telephones. A videophone can be used to

7    call a deaf person directly or to call a hearing person in another location via the Federal

8    Communications Commission's Video Relay Service ("VRS"). Through VRS, an ASL

9    interpreter engages in a video call with the deaf caller and a standard telephone call with the

10   hearing caller.

11       54.    The federal Telecommunications Relay Service fund provides videophones to

12   households with a deaf resident at no cost.

13   ***Defendants Systemically Deny Deaf Consumers Meaningful Access to DDS's I/DD Services***

14       55.    DDS provides habilitation services as part of its I/DD services program.

15   Improving communication skills is a common habilitation goal for I/DD service consumers.

16   However, DDS affords Plaintiffs and other class members an inferior opportunity to enjoy the

17   habilitative benefits of an immersive language environment compared to the opportunity

18   afforded to hearing consumers.

19       56.    Research indicates that deaf adults who never developed a fluent first language,

20   either spoken or signed, benefit from immersion in an environment in which all communication

21   is by sign. They rapidly acquire new words and increase their ability to have meaningful

22   exchanges, convey information, share thoughts, get needs met, and assist others in getting their

23   needs met.

24

25   _____

[7] Edward G. Carr & V. Mark Durand, *Reducing Behavior Problems Through Functional
26   Communication Training*, 24 J. OF APPLIED BEHAV. ANALYSIS 251 (1991); Matthew G. Hile &
Bonnie B. Walbran, *Observing Staff-resident Interactions: What Staff Do, What Residents
27   Receive*, 29 MENTAL RETARDATION 35 (1991); Harry Knoors & Mathijs Vervloed, *Educational
Programming for Multiple Handicapped Deaf Children*, 1 THE OXFORD HANDBOOK OF DEAF
28   STUD., LANGUAGE, & EDUC. 82 (2011); Margot I. Van Allen et al., *Health Care Concerns and
Guidelines for Adults with Down Syndrome*, 89 AM. J. MEDICAL GENETICS 100 (1999).

57.    Deaf consumers with I/DD who do not communicate fluently in ASL or another sign language frequently have the habilitation potential to improve their communication if provided with appropriate services, such as communication-rich environments that include sign language for those who have the receptive sign skills and signing plus additional augmentative forms of communication for those with lower receptive skills.

58.    Throughout the state, only a small number of I/DD service providers have signing staff and they serve only a small subset of DDS's deaf consumers.

59.    Plaintiffs have identified only one DDS-contracted day program that provides an immersive sign language environment for deaf consumers; this provider serves fewer than fifty people, most of whom reside in group homes without signing partners.

60.    Because Defendants have failed to ensure the availability of programs to meet deaf consumers' needs, deaf consumers frequently are denied the choices available to hearing consumers and provided only programs from which they cannot benefit.

61.    As part of each consumer's participation in the IPP planning process, regional centers conduct assessments to determine the consumer's "capabilities and strengths, preferences, barriers, and concerns or problems." Cal. Welf. & Inst. Code § 4646.5(a)(1). Assessments must be completed "by qualified individuals and performed in natural environments whenever possible" and "reflect awareness of, and sensitivity to, the lifestyle and cultural background of the consumer and the family." *Id.*

62.    Assessing spoken communication is a standard part of this assessment.

63.    Defendants and their agents have no system to assess the communication abilities and needs of deaf consumers with I/DD.

64.    Each deaf consumer with I/DD requires a comprehensive communication assessment to determine the most effective means of expressive and receptive communication at present and their habilitation potential to improve communication.

65.    In addition, a communication assessment will identify what kinds of auxiliary aids and services and accommodations are required, and the most effective method of communication.

66. Without appropriate communication assessments, Defendants and their contractors have failed to identify the communication needs and abilities of thousands of deaf consumers.

67. Without appropriate communication assessments, Defendants and their contractors fail to identify deaf consumers who have the capacity to learn ASL, improve their ASL fluency, or learn alternative forms of communication.

68. Defendants fail to ensure deaf consumers with I/DD receive communication assessments that are conducted by "qualified individuals" and that "reflect awareness of, and sensitivity to, the lifestyle and cultural background of the consumer and the family," Cal. Welf. & Inst. Code § 4646.5(a)(1). Without such assessments, Defendants and their contractors can only guess at the accommodations and habilitative services deaf consumers may require.

69. In addition to the lack of assessment, thousands of deaf consumers who are not currently fluent in ASL are denied habilitation services to improve communication because Defendants and their contractors do not make inclusive signing environments available where needed.

### Defendants Systemically Deny Effective Communication to Deaf Consumers

70. Defendants are failing, on a statewide basis, to adequately assess and meet the communication needs of deaf consumers. As a result of Defendants' failures, thousands of deaf consumers statewide are being denied equal access to the programs, services and activities provided by Defendants.

71. Throughout California, Defendants' deaf consumers who communicate using sign language have been placed in group homes and day programs without signing staff.

72. Defendants' I/DD service providers frequently do not hire sign language interpreters when they serve deaf consumers whose primary method of communication is sign language.

73. Defendants' contractors frequently hold IPP planning meetings for deaf consumers without consideration for or provision of the auxiliary aids and services that are necessary for effective communication. Without effective communication, deaf consumers

cannot meaningfully participate in a person-centered planning process.

74.    Throughout California, DDS-contracted regional centers frequently rely on family members or residential staff who know minimal sign language to interpret for deaf consumers at IPP meetings. This practice denies the deaf consumer the opportunity to freely participate in their IPP meeting or inform their service coordinator about concerns regarding treatment by the family member or staff.

75.    Defendants require their residential subcontractors to arrange deaf consumers' medical care and appointments, but those residential subcontractors routinely fail to request interpreters when arranging such medical services for deaf consumers.

76.    Defendants require their residential subcontractors to provide consumers access to telephones, and to assist in making calls upon request, but those subcontractors routinely fail to provide access to videophones or to assist in making videophone calls upon request.

### *Defendants Have Not Undertaken Reasonable Measures to Ensure Effective Communication and Meaningful Access to Deaf Consumers*

77.    Defendants have not promulgated any relevant regulations addressing compliance with the ADA, Section 504, and California Government Code § 11135 in the provision of I/DD services to deaf consumers.

78.    Defendants have not issued policies, procedures, or guidance on ensuring accessibility for deaf consumers.

79.    Defendants have not instructed DDS contractors and subcontractors regarding their obligations to ensure that I/DD services are accessible to deaf consumers, including through effective communication.

80.    Defendants have never issued a directive to DDS contractors and subcontractors explaining that they (a) have an affirmative obligation to provide accommodations for deaf consumers, (b) generally cannot rely on family or residential staff to interpret, and (c) must give primary consideration to the deaf consumer's preferred form of communication.

81.    Defendants have not provided notice to deaf I/DD consumers about their rights to effective communication or about accommodations related to their hearing disabilities.

82.    Defendants have not established or made public a grievance system to accept complaints from consumers or others regarding disability discrimination.

83.    Defendants have not designated an ADA coordinator to carry out its duty to provide effective communication and reasonable accommodations to deaf consumers with I/DD, including the investigation of complaints of disability discrimination, nor has it made the name and contact information of an ADA coordinator available to the public.

84.    Defendants have not conducted or required trainings on accessibility for deaf consumers.

85.    Defendants have not provided sufficient funding to secure necessary auxiliary aids and services, including qualified interpreters.

86.    Defendants have not ensured that DDS contractors and subcontractors provide necessary auxiliary aids and services, including qualified interpreters.

87.    Defendants have not ensured that DDS contractors and subcontractors assess deaf consumers' communication needs and provide appropriate accommodations to ensure effective communication.

88.    Defendants have not ensured that DDS contractors and subcontractors provide effective communication at group homes, day programs and other I/DD services.

89.    Defendants have not ensured that DDS contractors and subcontractors take affirmative steps to address deaf consumers' communication needs as part of IPP meetings and in individuals' IPP documents.

***Deaf Consumers are Harmed by Defendants' Failure to Provide Effective Communication and Meaningful Access to I/DD Services***

90.    The lack of appropriate programs for deaf consumers has damaging effects on Plaintiffs and the Class.

91.    Lack of communication access to report abuse, understand emergency evacuation directions, or communicate symptoms such as pain, discomfort, or the side effects of medications puts the health and safety of deaf consumers at risk.

92.    Deaf consumers are not receiving the habilitative services they need to improve their communication. They are being denied one of the most basic forms of habilitation—learning to communicate effectively with the world around them.

93.    Even in the few areas in which there are day programs with signing staff, deaf participants must return each day to group homes where they cannot communicate with peers or staff.

94.    Deaf consumers with I/DD will not have equal access to, or obtain an equal benefit from, DDS's I/DD services until the agency develops and implements a system in which the communication needs of deaf consumers are assessed by qualified professionals, and an adequate network of qualified providers who are familiar with Deaf culture and have sufficient capacity to meet the communication needs of deaf consumers to the same extent that existing providers meet the needs of hearing consumers.

## FACTUAL ALLEGATIONS REGARDING NAMED PLAINTIFFS

### *Plaintiff Lugene McCullough*

95.    Lugene McCullough has profound hearing loss and an intellectual and/or developmental disability.

96.    Mr. McCullough is seventy-one years old and has been deaf since at least two years of age.

97.    Mr. McCullough grew up in Louisiana and Texas with a large family, including two younger brothers who were also deaf. He attended a school for the deaf in Texas and was subsequently admitted to Rusk State Hospital in Rusk, Texas.

98.    In 1976, Mr. McCullough was discharged from Rusk State Hospital and his mother brought him to live with her in East Palo Alto, California.

99.    He was initially evaluated for receipt of DDS services in 1978 and began receiving I/DD services shortly thereafter.

100.    As a result of his I/DD, Mr. McCullough currently meets the eligibility requirements for the receipt of DDS's I/DD services.

101.    Mr. McCullough lives in a community care facility in Marin County.

102.    Defendant DDS contracts with Golden Gate Regional Center to provide I/DD services to consumers in Marin County.

103.    Under contract with DDS and using DDS funds, GGRC has provided I/DD services to Mr. McCullough for almost forty years.

104.    All of the staff and other residents at Mr. McCullough's group home are hearing and none of them are fluent in ASL.

105.    Mr. McCullough's IPP provides for day program services five days a week.

106.    All of the staff at Mr. McCullough's day program are hearing and none of them are fluent in ASL.

107.    Golden Gate Regional Center has assigned Mr. McCullough a service coordinator who provides case management services, convenes his IPP meeting, and implements his goals by arranging and supervising contracts with local vendors to provide his I/DD services and supports.

108.    On information and belief, none of Mr. McCullough's service coordinators have been fluent in ASL.

109.    Mr. McCullough communicates using some ASL signs and visual-gestural communication, but is not fluent in ASL.

110.    Mr. McCullough can write his name and some words in English, but he does not understand spoken or written English and does not use English to communicate expressively or receptively.

111.    Various documents from Mr. McCullough's I/DD service providers indicate that his language is English and staff at his day program and group home attempt to speak to him and communicate via written and spoken English.

112.    Documents indicate that, over the years, I/DD service providers have addressed Mr. McCullough's behavioral problems by writing to Mr. McCullough in English.

113.    When staff attempt to communicate with Mr. McCullough in writing, he frequently copies single words that they have written, responds with singular words that are not responsive, or circles the first option given.

114.    I/DD service providers have routinely provided Mr. McCullough with documents to sign, including releases of information, IPP approvals, and other documents, without any attempt to effectively communicate the information in the document to Mr. McCullough or ensure that he understands the content or purpose of his signature.

115.    I/DD service providers' communication methods with Mr. McCullough have varied over the years. His 2016 and 2017 group home Individual Service Plans ("ISP") state that "Mr. McCullough is provided with a tablet for communication and he writes various words from time to time" while his 2019 ISP states that "staff have accessed an ASL book to use with Eugene[8] [sic]." A February 2019 worksheet on Person Centered Tools and Practices instructs day program staff to "[s]peak slowly and directly in front of Lugene so he is able to understand" and to "[h]ave a pen and paper handy for Lugene to communicate in writing what he would like to have us know."

116.    There is no suggestion in Mr. McCullough's regional center file that a Certified Deaf Interpreter who is skilled in gestural communication has ever been provided during an IPP or ISP meeting.

117.    Mr. McCullough has the capacity to improve his ability to communicate using sign language through a habilitation plan.

118.    Communication has been a consistent goal for Mr. McCullough in his IPPs, but little has been done to provide meaningful habilitative communication services.

119.    I/DD service providers' documented plans to improve Mr. McCullough's communication skills have involved "a written communication book, gestures, and learning limited signs" but, Mr. McCullough's records do not reflect any appropriate efforts to achieve communication skills.

120.    Mr. McCullough's records indicate a brief period of services from sign language staff. In or about early 2013, a skills instructor who was hearing impaired and used sign

---

[8] Mr. McCullough has been provided so little effective communication that at some point some DDS service providers began frequently referring to him as Eugene instead of Lugene without being corrected.

language started working with Mr. McCullough at his day program. Mr. McCullough's records indicate that only a short time after the instructor began working with Mr. McCullough, he was "learning and communicating more frequently using ASL." It is unclear how long this skills instructor worked with Mr. McCullough, but Mr. McCullough transitioned to a different day program in early 2015.

121.    The decades of communication isolation that Mr. McCullough has experienced and ongoing ineffective communication with his I/DD service providers has led to serious negative effects.

122.    Mr. McCullough's Individual Service Plans, prepared by day programs, have consistently recognized that his "potential abilities for communication may be overshadowed by the fact that Eugene [sic] does not live in a deaf environment"; noting that he "continues to suffer from depression and anhedonia, most likely feeling cut off from his family (by distance) and from people in general (by his hearing impairment and compromised ability to communicate.)" However, DDS and its contractors have done little to address these significant detrimental effects of language isolation.

123.    Mr. McCullough has a history of frequently inserting toilet paper and other items into his ears. A behavior that doctors have noted suggests discomfort.

124.    In August 2014, Mr. McCullough was poisoned from anesthesia administered during a dental procedure but was unable to communicate his symptoms with service providers. This caused a months-long deterioration in his health, including cognitive functioning and motor coordination, that resulted in Mr. McCullough's day program moving him from the community integration program into another program where he remained onsite. Eventually, the day program determined that, given Mr. McCullough's declining functioning, they were no longer able to meet his needs, and he was moved to his current day program. Before determining anesthesia poisoning to be the etiology of Mr. McCullough's health deterioration, physicians tested him for strokes and Alzheimer's disease. There is no indication that a Certified Deaf Interpreter who is skilled in gestural communication was ever provided to facilitate communication during this period of declining functioning and medical testing.

125.    Mr. McCullough's group home provides a telephone for hearing residents to use but does not provide a videophone for Mr. McCullough to use, despite his sister's repeated requests that such a system be enabled so that she could maintain communication with him, and despite the fact that videophones are available at no charge to households with a deaf resident through the Telecommunications Relay Service fund.

### *Plaintiff Gina Lamberton*

126.    Gina Lamberton has profound hearing loss and an intellectual and/or developmental disability. She is sixty years old.

127.    Ms. Lamberton has been deaf since birth and was raised by Deaf parents. ASL was the language of communication in Ms. Lamberton's childhood home, so she was immersed in an ASL environment throughout her youth.

128.    ASL is Ms. Lamberton's first language and primary method of communication.

129.    Ms. Lamberton cannot read lips and does not speak.

130.    Ms. Lamberton is not fluent in written English. She has difficulty understanding and even greater difficulty expressing herself in written English. While she can write short sequences of English words, she does so using ASL syntax that is likely to be misunderstood by individuals reading the words as if they were written by someone who is fluent in English.

131.    As a result of her I/DD, Ms. Lamberton meets the eligibility requirements for the receipt of DDS's I/DD services.

132.    Ms. Lamberton lives in a community care facility in Riverside County, California.

133.    Defendant DDS contracts with Inland Regional Center to provide I/DD services to consumers in Riverside County.

134.    Under contract with DDS and using DDS funds, Inland Regional Center has provided I/DD services to Ms. Lamberton for more than twenty years.

135.    Ms. Lamberton's IPP provides for day program services and a small stipend for helping with a Meals-on-Wheels program. She is proud of her work and would like to work more and earn more money.

136.    Ms. Lamberton likes to go bowling and enjoys shopping and visits to a local casino on special occasions; she would like to socialize with other deaf people who also use ASL.

137.    Ms. Lamberton would like to live in a home where she can meaningfully communicate with staff and housemates.

138.    Ms. Lamberton cannot communicate in ASL with the staff in her residence or day program. Defendants and their contractors have failed to develop and implement service options and providers that are able to meet her functional and habilitative communication needs.

139.    Ms. Lamberton's I/DD service records from Inland Regional Center show no evidence that the DDS contractor has ever arranged for a communication assessment of Ms. Lamberton in ASL by an assessor familiar with the communication needs of deaf people with I/DD.

140.    The DDS-contracted staff assigned to support her have disregarded Ms. Lamberton's communication needs and preferences. They insist on communicating with Ms. Lamberton via written notes in all settings, including during important meetings regarding her IPP.

141.    Inland Regional Center has assigned Ms. Lamberton a service coordinator who provides case management services, convenes her IPP meeting, and implements her goals by arranging and supervising contracts with local vendors to provide her with services and supports specified in her IPP.

142.    On information and belief, none of Ms. Lamberton's service coordinators have been fluent in ASL. Prior to her 2019 IPP meeting, Ms. Lamberton's service coordinator conducted IPP meetings with Ms. Lamberton without any ASL interpretation. Without an interpreter, Ms. Lamberton could not participate in her IPP meetings, understand her choices, or express her needs and desires. Her IPP did not include goals or services to ensure she has access to effective communication or to communication habilitation.

143.    Ms. Lamberton's 2018 IPP narrative states that "she does not use words to

communicate as she is deaf. [Ms. Lamberton] uses an understand [sic] gestures and facial expressions in communication. She communicates by using sign language and writing on her tablet or paper. She also reads lips."

144. The narrative is factually incorrect, as she does not read lips and it suggests written English is an effective form of communication for Ms. Lamberton.

145. On information and belief, Ms. Lamberton's 2018 IPP meeting was conducted without an ASL interpreter and the narrative was not signed to her in ASL. The reading level in the IPP narrative is beyond her comprehension, so she did not have an opportunity to confirm or object to what was said in the IPP. As a result, the 2018 IPP does not represent her wishes, goals, or abilities.

146. Because Ms. Lamberton's I/DD service providers limited their method of communication with Ms. Lamberton to written English, she has been unable to effectively communicate her preference for ASL and her objection to communicating in writing.

147. On June 4, 2019, for the first time and upon the request of counsel, Inland Regional Center provided Ms. Lamberton with an ASL interpreter at her IPP meeting.

148. Following Ms. Lamberton's 2019 IPP meeting, her IPP was amended to include a communication goal for the first time.

149. Because of her I/DD, Ms. Lamberton is eligible for residential supports through DDS's I/DD services program. Residential supports take the form of placement in a community care facility, also known as a group home, or supported living services to enable the consumer to live in an apartment with a roommate and supports.

150. Inland Regional Center placed Ms. Lamberton in her current group home several years ago.

151. Inland Regional Center contracts with Ms. Lamberton's group home to provide important I/DD services to her, including food, clothing, and shelter. The group home receives additional DDS funding from the regional center because it is licensed to provide care, supervision, and ongoing training for persons with significant deficits in self-help skills, limitations in physical coordination and mobility, or disruptive or self-injurious behavior. Staff

1    are on duty at Ms. Lamberton's group home twenty-four hours per day to ensure residents'

2    safety and attend to their needs.

3        152.    There are five other residents in Ms. Lamberton's group home; all are hearing

4    and do not know ASL. Ms. Lamberton shares a room with one of these hearing residents.

5        153.    The staff at Ms. Lamberton's group home do not know sign language and do not

6    use ASL interpreters. Staff attempt to communicate with her using written English and verbal

7    prompts, although they are aware that Ms. Lamberton cannot hear or understand what they are

8    saying.

9        154.    Staff have posted written schedules and instructions for residents, but the reading

10    level is beyond Ms. Lamberton's comprehension. For example, the schedule lists personal

11    hygiene and grooming as an evening activity. When asked in ASL what this meant, Ms.

12    Lamberton responded by making a gesture for sweeping with a broom.

13        155.    Without interpretation, staff cannot explain Ms. Lamberton's schedule, upcoming

14    events, or what to anticipate for the day; and Ms. Lamberton can neither communicate her

15    needs, goals, or concerns to staff nor develop emotional rapport with staff or residents.

16    Ms. Lamberton is isolated from staff and residents and excluded from activities.

17        156.    Ms. Lamberton's group home has a telephone for the use of hearing residents.

18    However, until she was represented by counsel, her group home did not have a working

19    videophone. Staff do not know how to use a videophone to place a call for her and cannot assist

20    Ms. Lamberton in placing videophone calls when she wants to communicate with others, such

21    as her service coordinator, her attorneys, her brother, or Deaf acquaintances.

22        157.    Ms. Lamberton's group home is responsible for arranging her medical care and

23    her service coordinator reviews their performance at her IPP meetings. The group home staff

24    has arranged monthly visits from a doctor and a behaviorist at her group home as well as

25    outside medical care, to which they transport her. Neither the regional center nor the group

26    home has arranged ASL interpreters for these visits. As a result, Ms. Lamberton is unable to

27    understand or consent to medical and mental health care and cannot communicate effectively

28    about her symptoms or concerns.

158.    Ms. Lamberton has been diagnosed with chronic kidney failure and will soon require dialysis. To understand, consent to, and prepare for this medical intervention, Ms. Lamberton must receive information about this procedure through means of effective communication. None of Defendants' contracted I/DD service providers has arranged to provide an explanation of her condition to Ms. Lamberton using appropriate ASL and Certified Deaf Interpreters.

159.    Ms. Lamberton is unhappy in her group home because there are no staff or residents with whom she can sign. She wants to live with other deaf residents and Deaf or signing staff.

160.    On multiple occasions, Ms. Lamberton has attempted to pack her belongings and leave the house and has had several behavioral outbursts related to her unhappiness. Her group home staff cannot assist or support her because they cannot communicate with her in ASL.

161.    Inland Regional Center is not able to meet Ms. Lamberton's request for a group home with deaf residents and signing staff. Although it has contracts with two group homes with signing staff and deaf residents, these have no vacancies and little turn-over.

162.    Because Inland Regional Center cannot meet Ms. Lamberton's request for a group home with signing staff, they agreed at the 2019 IPP meeting to explore supported living services for Ms. Lamberton. Supported living services enable consumers to live independently, alone or with a roommate, in a home or apartment; consumers must qualify based on behavior and independent living skills. Even if Ms. Lamberton qualifies, implementation of such supported living services could take months or even years.

163.    Inland Regional Center cannot satisfy Ms. Lamberton's request for a group home with signing staff because Defendants and their contractors have not developed sufficient programs with deaf or signing staff to meet the needs of deaf consumers.

164.    Ms. Lamberton's IPP provides for behavioral supports and vocational training at a day program four hours per day, five days per week. None of the staff at the day program sub-contracted by Inland Regional Center with DDS funds to provide these services is fluent in ASL.

165.    Without ASL interpretation, day program staff cannot effectively explain activities or safety procedures to Ms. Lamberton or provide her the benefit of vocational training that is afforded to hearing participants. In addition, Ms. Lamberton cannot effectively express her preferences and needs to day program staff.

166.    In the event of an emergency such as an earthquake, fire, or evacuation at her group home or her day program, staff cannot explain to Ms. Lamberton what to do, nor can they reassure her about her safety or explain to her what to expect. For an individual with I/DD such as Ms. Lamberton, uncertainty and a disruption of her regular routine can be especially upsetting if no one is able to explain to her what might happen next.

167.    Ms. Lamberton's day program closed in March 2020 in response to the COVID-19 pandemic. In addition, the CEO of the company that runs her residential home released a memorandum to day programs and group home care staff stating that all of their consumers will stay home to avoid exposure to COVID-19. In the following days, Ms. Lamberton was confused and upset to the point that she exhibited crying fits. Ms. Lamberton's home care staff were unable to effectively communicate to Ms. Lamberton the reason for the program closure. While they showed Ms. Lamberton the CEO's memo, the reading level is too difficult for Ms. Lamberton to understand.

168.    Ms. Lamberton's group home and day program both have smoke alarms that emit loud sounds to warn hearing residents of potential fire danger. Neither has visual alarms to alert Ms. Lamberton of the danger of fire.

169.    Ms. Lamberton has the capacity to improve her ability to communicate in ASL through a habilitation plan.

170.    Defendants and their contracted regional center have failed to identify Ms. Lamberton's need for communication habilitation or to provide her the benefit of habilitation services as a part of DDS's I/DD services program.

### Plaintiff Josonia Bishara

171.    Josonia Bishara has profound hearing loss and an intellectual and/or developmental disability.

172.    As a result of her I/DD, Ms. Bishara meets the eligibility requirements for the receipt of Defendants' I/DD services.

173.    Ms. Bishara lives in a group home in Riverside County, California.

174.    Under contract with DDS and using DDS funds, Inland Regional Center has provided I/DD services to Ms. Bishara for more than twenty years.

175.    Ms. Bishara has been deaf since birth and was raised by Deaf parents. ASL was the language of communication in Ms. Bishara's childhood home, so she was immersed in an ASL environment in her youth. She is now forty-eight years old.

176.    ASL is Ms. Bishara's first language and primary mode of communication. She cannot communicate effectively other than through ASL.

177.    Ms. Bishara cannot read lips and does not speak.

178.    Ms. Bishara is not literate in written English. She has difficulty understanding simple sentences and even greater difficulty expressing herself in written English. She can read some individual English words but does not understand sentence structure, grammar, or more than a few words in sequence. She often responds to a written note by circling a familiar word. She can write a small number of words and write sequences of a few words in English but connects these through ASL syntax. She expresses an aversion to communicating in written English and always prefers to communicate in ASL.

179.    Ms. Bishara greatly values opportunities to communicate using ASL. She wishes to share her hobbies, such as assembling puzzles, with others. She would like to live in a group home and participate in a day program where she can communicate with staff and others in ASL.

180.    Ms. Bishara cannot communicate in ASL with the staff in her residence and day program. On information and belief, DDS and its contractors have failed to develop service options and providers that are able to meet her functional and habilitative communication needs.

181.    On information and belief, no DDS I/DD service provider has ever arranged for a communication assessment of Ms. Bishara in ASL by an assessor familiar with the

communication needs of deaf people with I/DD. Ms. Bishara's records from Inland Regional Center do not contain any record of such an assessment.

182.    DDS-contracted staff assigned to support Ms. Bishara have disregarded her communication needs and preferences. They insist on communicating with Ms. Bishara via written notes in all settings, including during important meetings regarding her IPP.

183.    Inland Regional Center has assigned Ms. Bishara a service coordinator who provides case management services, convenes her IPP meeting, and implements her goals by arranging and supervising contracts with local vendors to provide her I/DD services and supports.

184.    Inland Regional Center has assigned Ms. Bishara service coordinators who do not know ASL. On information and belief, for more than twenty years, her service coordinators did not arrange ASL interpreters for her IPP meetings or for any other contacts with her. Without an ASL interpreter, Ms. Bishara cannot understand the purpose of the meeting or her choices and cannot express her goals and desires. She was unable to communicate her needs, preference for ASL, or objection to communicating in writing because Inland Regional Center did not engage an ASL interpreter and offered her no way to express this.

185.    Ms. Bishara's 2018 IPP states that she "likes to engage in communication with others by ASL or via in [sic] writing. She may have extensive conversations by writing back and forth. She is able to communicate her needs via writing or by signing."

186.    On information and belief, this IPP meeting was conducted without an ASL interpreter and the narrative was not signed to Ms. Bishara in ASL. The reading level in the IPP narrative is beyond Ms. Bishara's comprehension, so she did not have an opportunity to confirm or object to what was said in the IPP. As a result, the 2018 IPP does not represent her wishes, goals, or abilities.

187.    At her IPP meeting on June 5, 2019, as a result of counsel's request, the regional center provided an ASL interpreter for Ms. Bishara for the first time.

188.    During her 2019 IPP meeting, Ms. Bishara signed that she does not want to write notes to communicate and prefers ASL.

189.    Prior to 2019, Ms. Bishara's IPPs have not included a communication goal or services to ensure she had access to effective communication. Only after she was represented by counsel was her 2019 IPP amended to include a communication goal and limited communication supports.

190.    Ms. Bishara's parents and adult brother are all Deaf and communicate primarily through ASL. Ms. Bishara is very close to her family and wants to include her family members in her life and her planning for the future, as is her right under the Lanterman Act. Defendants' contracted I/DD service providers have refused to arrange for interpreters to communicate with Ms. Bishara's family members or to allow them to participate in her IPP meetings, denying her the benefit of their participation and support as part of her I/DD services.

191.    Because of her I/DD, Ms. Bishara is eligible for residential supports through DDS's I/DD services program.

192.    Inland Regional Center placed Ms. Bishara at her current group home in 1998. There are fourteen residents in the home. Ms. Bishara is the only deaf resident.

193.    The staff in Ms. Bishara's group home cannot communicate in ASL and do not use ASL interpreters. Instead, staff attempt to communicate with Ms. Bishara using written English—which is not effective for her; or gestures—which are frequently insufficient and not appropriate. Staff attempt to use verbal prompts, although they are aware that Ms. Bishara cannot hear or understand what they are saying.

194.    Ms. Bishara's group home is responsible for providing key services within DDS's I/DD services program, including care, supervision, and training in self-help skills as well as food, clothing, and shelter. The group home receives additional DDS funding because Ms. Bishara is identified as a person with significant deficits in self-help skills, and/or disruptive or self-injurious behavior. Staff are on duty at Ms. Bishara's group home twenty-four hours per day to ensure residents' safety and attend to their needs.

195.    Hearing residents in Ms. Bishara's group home can communicate with staff about their feelings, concerns, wishes, and goals. Staff can communicate effectively with hearing residents about upcoming activities, menu planning, and safety issues and teach them

1  independent living skills, such as personal safety, traveling on public transportation, and

2  managing money.

3      196.    Ms. Bishara cannot effectively communicate with staff in her group home. Staff

4  cannot explain her schedule, upcoming events, or what to anticipate for her day. She cannot

5  develop emotional rapport with staff so as to confide in them or obtain emotional support. She

6  is isolated from staff and residents and excluded from activities in the group home.

7      197.    Staff are unable to understand, assist, or support Ms. Bishara when she is

8  distressed, experiencing pain, or requires medical care. Ms. Bishara frequently has severe

9  migraines but, without interpreters or signing staff, she has not been able to communicate with

10 group home staff or her medical providers about her pain and this health issue. Without

11 interpreters, staff were unaware of the extent and intensity of Ms. Bishara's pain. Ms. Bishara

12 was finally able to raise this issue during a visit from her counsel, when she could use their

13 ASL interpreter to tell staff at her group home that she wanted to see a doctor.

14     198.    Ms. Bishara's group home provides a telephone for hearing residents to use but,

15 until recently did not provide a videophone for Ms. Bishara to use, despite the fact that

16 videophones are available at no charge to households with a deaf resident through the

17 Telecommunications Relay Service fund. Ms. Bishara wanted to use a videophone to call her

18 brother and other people such as her regional center service coordinator, just as hearing

19 residents can make calls on a regular phone. Her brother arranged for installation of a

20 videophone at her group home, which is now installed, but group home staff do not know how

21 to use it and cannot help her make calls.

22     199.    Ms. Bishara's group home is responsible for arranging her medical care and her

23 service coordinator reviews their performance at her IPP meetings. The group home staff has

24 arranged monthly visits from a doctor and a psychiatrist at her group home as well as outside

25 medical care, to which they transport her. However, neither the regional center nor the group

26 home has arranged ASL interpreters for these visits. As a result, Ms. Bishara is unable to

27 understand or consent to medical and mental health care and cannot communicate effectively

28 regarding her symptoms or concerns.

200.    Ms. Bishara's IPP also provides for behavioral supports and vocational training at a day program four hours per day, five days per week. This day program is sub-contracted by Inland Regional Center with DDS funds. None of the staff at the day program are fluent in ASL.

201.    Ms. Bishara's day program is responsible for addressing her behavior issues and has an Individualized Service and Behavior Plan to address these. The plan instructs staff to provide "verbal prompts" to Ms. Bishara even though she cannot hear or understand what they are saying.

202.    In March 2020, during the statewide COVID-19 pandemic response, Ms. Bishara's day program closed. Staff at neither the day program nor the residential home were able to effectively communicate to Ms. Bishara the reason for her program closure and the change in circumstances.

203.    Ms. Bishara is unable to benefit from the programs, services, activities, and opportunities provided to hearing participants at the day program because she cannot effectively communicate with staff to the same extent as hearing participants. Staff cannot explain activities or provide the vocational training afforded to hearing participants. Ms. Bishara cannot develop rapport with staff to enable her to confide in them or obtain emotional support. She is isolated from staff and peers and excluded from activities.

204.    In the event of an emergency such as an earthquake, fire, or evacuation at her group home or her day program, staff cannot explain to Ms. Bishara what to do, nor can they reassure her about her safety or explain to her what to expect. For an individual with I/DD such as Ms. Bishara, uncertainty and a disruption of her regular routine can be especially upsetting if no one is able to explain to her what might happen next.

205.    Ms. Bishara's group home and day program have smoke alarms that emit loud sounds to warn hearing residents of potential fire danger. The group home does not have visual alarms to alert Ms. Bishara of the danger of fire.

206.    After more than twenty years without a communication partner, Ms. Bishara's ASL skills have deteriorated. However, she has the capacity to improve her ability to

communicate in ASL through an appropriate habilitation plan.

207.    Defendants and their contracted service providers have failed to identify Ms. Bishara's need for communication habilitation or to provide her the benefit of habilitation services as a part of DDS's I/DD services program.

## FIRST CLAIM FOR RELIEF

### Title II of the Americans with Disabilities Act
### 42 U.S.C. § 12131 *et seq.*

208.    Plaintiffs reallege and incorporate by reference the allegations above as if fully set forth here.

209.    Title II of the ADA provides: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by such entity." 42 U.S.C. § 12132; *see also* 28 C.F.R. § 35.130(a), (b)(1).

210.    Title II prohibits public entities from discriminating against individuals with disabilities, either directly or through contractual arrangements. 42 U.S.C. § 12132; 28 C.F.R. § 35.130(a), (b)(1).

211.    Defendant DDS has been and is a "public entity" within the meaning of Title II of the ADA. 42 U.S.C. § 12131(1).

212.    Plaintiffs and class members have physical impairments that substantially limit one or more major life activities, including hearing.

213.    Plaintiffs and class members are "qualified individuals with a disability" within the meaning of Title II of the ADA and its implementing regulations and meet the essential eligibility requirements for receipt of DDS's services, programs, or activities. 42 U.S.C. §§ 12102(2), 12131(2); 28 C.F.R. § 35.104.

214.    DDS's I/DD services program and all of the program's benefits, activities, and services are a program, service, or activity that Defendant DDS offers, within the meaning of Title II.

215.    Under Title II, public entities, including DDS, must take appropriate steps to ensure that communications with applicants, participants, members of the public, and

companions who are deaf are as effective as communications with those who are hearing. 28

C.F.R. § 35.160(a).

216.    Pursuant to Title II's implementing regulations, public entities, including DDS,

must furnish appropriate auxiliary aids and services where necessary to afford deaf individuals,

including applicants, participants, companions, and members of the public, an equal

opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a

public entity. *Id.* § 35.160(b)(1).

217.    Auxiliary aids and services may include qualified sign language interpreters,

exchange of written notes, assistive listening devices, open and closed captioning, and other

effective methods of making aurally delivered information available. *Id.* § 35.104. However,

the auxiliary aid or service used must be both appropriate and effective. *Id.* § 35.160(b)(1)–

(b)(2).

218.    In order to be effective, the auxiliary aid or service must be provided in an

accessible format, in a timely manner, and in such a way as to protect the privacy and

independence of the individual with a disability. *Id.* § 35.160(b)(2).

219.    Title II's implementing regulations provide that "[t]he type of auxiliary aid or

service necessary to ensure effective communication will vary in accordance with the method

of communication used by the individual; the nature, length, and complexity of the

communication involved; and the context in which the communication is taking place." *Id.*

§ 35.160(b)(2).

220.    Furthermore, when selecting an auxiliary aid or service to use, public entities

must give "primary consideration to the requests of individuals with disabilities." 28 C.F.R.

§ 35.160(a), (b)(2). The United States Department of Justice, charged with interpreting the

ADA, issued the following guidance regarding effective communication:

> It is important to consult with the individual to determine the most
> appropriate auxiliary aid or service, because the individual with a
> disability is most familiar with [their] disability and is in the best
> position to determine what type of aid or service will be effective.
> Some individuals who were deaf at birth or who lost their hearing
> before acquiring language, for example, use sign language as their
> primary form of communication and may be uncomfortable or not

proficient with written English, making use of a notepad an ineffective means of communication.

*The Americans with Disabilities Act: Title II Technical Assistance Manual* § II-7.1100,

*available at* https://www.ada.gov/taman2.html.

221.    Public entities, including DDS, "shall make reasonable modifications in policies, practices or procedures when the modifications are necessary to avoid discrimination on the basis of disability[.]" 28 C.F.R. § 35.130(b)(7).

222.    Title II of the Americans with Disabilities Act mandates that covered entities act affirmatively to evaluate the programs and services they offer to ensure that people with disabilities will have meaningful access to those programs and services. *Updike v. Multnomah Cty.*, 870 F.3d 939, 949 (9th Cir. 2017); see also *Pierce v. D.C.*, 128 F. Supp. 3d 250, 269 (D.D.C. 2015) (holding that, where a disability such as deafness is obvious, individuals need not make an affirmative request for accommodations such as interpreters).

223.    In providing any aid, benefit, or service, a public entity may not, directly or through contractual, licensing, or other arrangements:

  a. afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to the opportunity afforded others, 28 C.F.R. § 35.130(b)(1)(ii); or

  b. provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others, *id.* § 35.130(b)(1)(iii).

224.    Further, public entities may not, directly or through contractual or other arrangements, employ methods of administering their programs that result in discrimination. 28 C.F.R. § 35.130(b)(3).

225.    A public entity must provide notice of the ADA's protections against discrimination to participants in its services, programs, or activities. *Id.* § 35.106.

226.    A public entity that employs fifty or more persons must designate an employee to

1  coordinate its efforts to comply with and carry out the entity's responsibilities under the ADA;

2  make the name, office address, and telephone number of the employee available to the public;

3  and adopt and publish a grievance procedure to resolve complaints of disability discrimination.

4  28 C.F.R. § 35.107.

5  227.  DDS's lack of any policies, procedures, or practices regarding accessibility for

6  deaf consumers results in the widespread denial of effective communication. It also denies deaf

7  consumers the opportunity to benefit from DDS's I/DD services, programs, and benefits that is

8  afforded to hearing consumers.

9  228.  In overseeing the provision of statewide I/DD services, DDS violates the ADA

10  by, *inter alia*:

11         a.   failing to ensure that I/DD service providers communicate effectively
12              with Plaintiffs and class members, giving primary consideration to their
13              requested auxiliary aids and services;

14         b.   denying Plaintiffs and class members the opportunity to participate in and
15              benefit from DDS's services, programs, and activities;

16         c.   affording Plaintiffs and class members an opportunity to participate in or
17              benefit from DDS's aids, benefits, or services that is not equal to the
18              opportunity afforded hearing consumers;

19         d.   providing Plaintiffs and class members with I/DD services that are not as
20              effective in affording an opportunity to obtain the same result, to gain the
21              same benefit, or to reach the same level of achievement as those provided
22              to hearing consumers;

23         e.   failing to provide reasonable modifications in policies, practices, and
24              procedures when the modifications are necessary to avoid discrimination
25              and would not fundamentally alter the nature of the services, programs, or
26              activities;

27         f.   using methods of administration that have the effect of subjecting
28              Plaintiffs and class members to discrimination on the basis of disability,

and of defeating or substantially impairing accomplishment of the objectives of DDS's I/DD services program with respect to Plaintiffs and class members;

g.    failing to provide notice to deaf I/DD consumers of their rights and protections under the ADA;

h.    failing to establish an ADA complaint system; and

i.    failing to appoint an ADA coordinator and make the individual's contact information publicly available.

229.    DDS's violations of the ADA have harmed and will continue to harm Plaintiffs and class members in the future.

230.    Because DDS's discriminatory conduct is ongoing, declaratory and injunctive relief are appropriate remedies.

231.    Plaintiffs are entitled to declaratory and injunctive relief, as well as reasonable attorneys' fees and costs incurred in bringing this action.

232.    Pursuant to the remedies, procedures, and rights set forth in 42 U.S.C. § 12188, Plaintiffs pray for relief as set forth below.

## SECOND CLAIM FOR RELIEF
### Section 504 of the Rehabilitation Act
### 29 U.S.C. § 794 *et seq.*

233.    Plaintiffs reallege and incorporate by reference the allegations above as if fully set forth here.

234.    Section 504 of the Rehabilitation Act of 1973 provides in relevant part: "No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a); *see also* 45 C.F.R. §§ 84.4(b), 84.21, 84.52.

235.    Defendant DDS has been and is a recipient of federal financial assistance within the meaning of Section 504, and its implementing regulations.

236.    DDS's I/DD services program is a "program or activity receiving Federal

financial assistance" because DDS receives federal financial assistance for I/DD services.

237.    Plaintiffs and class members have physical impairments that substantially limit one or more major life activities. They are qualified individuals with disabilities within the meaning of Section 504 and are otherwise qualified to participate in and receive benefits from DDS's I/DD services. 29 U.S.C. § 794(b).

238.    Recipients of federal financial assistance, including Defendant DDS, are prohibited from denying a qualified person with a disability any health, welfare, or other social services or benefits on the basis of disability. 45 C.F.R. § 84.52(a)(1).

239.    Recipients of federal financial assistance, including Defendant DDS, may not afford a qualified individual with a disability an opportunity to receive health, welfare, or other social services or benefits that is not equal to that afforded people without disabilities. 45 C.F.R. § 84.52(a)(2).

240.    Recipients of federal financial assistance, including Defendant DDS, may not, on the basis of disability, provide a qualified person with a disability health, welfare, or other social services or benefits that are not as effective as the benefits or services provided to others. 45 C.F.R. § 84.52(a)(3).

241.    Recipients of federal financial assistance, including Defendant DDS, may not provide any health, welfare, or other social services or benefits in a manner that limits or has the effect of limiting the participation of qualified individuals with disabilities. 45 C.F.R. § 84.52(a)(4).

242.    Recipients of federal financial assistance, including Defendant DDS, must "provide appropriate auxiliary aids to persons with impaired sensory, manual, or speaking skills, where necessary to afford such persons an equal opportunity to benefit from the service in question." 45 C.F.R. § 84.52(d).

243.    Auxiliary aids may include interpreters and other aids for persons with impaired hearing. 45 C.F.R. § 84.52(d)(3).

244.    Defendant DDS, through its actions and omissions, discriminates against Plaintiffs and class members solely by reason of their disabilities in violation of Section 504

and its implementing regulations. DDS's discriminatory conduct includes but is not limited to:

       a.    excluding Plaintiffs and class members from the opportunity to participate in and benefit from I/DD programs, services, and activities;

       b.    affording Plaintiffs and class members an opportunity to participate in or benefit from the I/DD system that is not equal to the opportunity afforded hearing consumers;

       c.    providing Plaintiffs and class members I/DD services that are not as effective as those provided to hearing consumers;

       d.    providing I/DD services in a manner that limits or has the effect of limiting the participation of Plaintiffs and class members in the I/DD services program;

       e.    using methods of administration that have the effect of subjecting Plaintiffs and class members to discrimination on the basis of disability, and that have the effect of defeating or substantially impairing accomplishment of the objectives of DDS's I/DD services program with respect to Plaintiffs and class members;

       f.    failing to provide Plaintiffs and class members with appropriate auxiliary aids where necessary to afford them an equal opportunity to benefit from I/DD services; and

       g.    failing to provide reasonable modifications in policies, practices, and procedures when the modifications are necessary to avoid discrimination on the basis of disability and would not fundamentally alter the nature of DDS's services, programs, or activities.

245.    Defendant DDS's violations of Section 504 have harmed and will continue to harm Plaintiffs and class members in the future.

246.    Because Defendant DDS's discriminatory conduct is ongoing, declaratory and injunctive relief are appropriate remedies.

247.    Plaintiffs are entitled to declaratory and injunctive relief, as well as reasonable

attorneys' fees and costs in bringing this action.

248. Pursuant to the remedies, procedures, and rights set forth in 29 U.S.C. § 794(a) and § 794a, Plaintiffs pray for relief as set forth below.

### THIRD CLAIM FOR RELIEF
**California Government Code § 11135**

249. Plaintiffs reallege and incorporate by reference the allegations above as if fully set forth here.

250. Section 11135(a) of the California Government Code provides in relevant part: "No person in the State of California shall, on the basis of . . . disability, . . . be unlawfully denied the benefits of, or be unlawfully subjected to discrimination under, any program or activity that is conducted, operated, or administered by the state or by any state agency, is funded directly by the state, or receives any financial assistance from the state."

251. Defendants' I/DD services program is "a program or activity that is conducted, operated, or administered by the state or by any state agency, is funded directly by the state, or receives any financial assistance from the state."

252. Defendant DDS has been and is a state agency as described in Section 11135(a).

253. California Government Code § 11135(b) incorporates the protections and prohibitions contained in the Americans with Disabilities Act ("ADA") and its implementing regulations. Section 11135(b) states in relevant part:

> With respect to discrimination on the basis of disability, programs and activities subject to subdivision (a) shall meet the protections and prohibitions contained in Section 202 of the federal Americans with Disabilities Act of 1990 (42 U.S.C. Sec. 12132), and the federal rules and regulations adopted in implementation thereof, except that if the laws of this state prescribe stronger protections and prohibitions, the programs and activities subject to subdivision (a) shall be subject to the stronger protections and prohibitions.

254. For all the reasons described above, Defendant DDS has violated and continues to violate the Americans with Disabilities Act and therefore has violated and continues to violate California Government Code § 11135(b).

255. Independent of any violation of the Americans with Disabilities Act, Defendants

1    have also violated the terms of California Government Code § 11135(a), which prohibits

2    discrimination on the basis of disability.

3        256.    Pursuant to California Government Code § 11139, Plaintiffs have a private right

4    of action to enforce California Government Code § 11135(b).

5        257.    Defendants and their agents and employees have and continue to violate

6    California Government Code § 11135 by unlawfully denying Plaintiffs the benefits of, and

7    unlawfully subjecting Plaintiffs to discrimination under, DDS's I/DD services program for the

8    reasons set forth above.

9        258.    Defendants have refused and failed to ensure that Plaintiffs and class members

10   have full and equal access to its programs, services, and activities as required by California

11   Government Code § 11135 *et seq.*

12       259.    Defendants' violations of California Government Code § 11135 have harmed and

13   will continue to harm Plaintiffs and class members.

14       260.    Because Defendants' discriminatory conduct is ongoing, declaratory and

15   injunctive relief are appropriate remedies.

16       261.    Plaintiffs are entitled to declaratory and injunctive relief as well as reasonable

17   attorneys' fees and costs incurred in bringing this action.

18       262.    Pursuant to the rights, procedures, and remedies set forth under in California

19   Government Code § 11135 and § 11139, and the California Code of Civil Procedure, Plaintiffs

20   pray for relief as set forth below.

21                                  **PRAYER**

22           WHEREFORE, Plaintiffs request that this Court:

23   1.     Exercise jurisdiction over their claims;

24   2.     Certify that this lawsuit may be maintained as a class action under Federal Rule

25   of Civil Procedure 23(a) and 23(b)(2);

26   3.     Enter declaratory relief finding that Defendants' above-described actions violate

27   Title II of the Americans with Disabilities Act and its implementing regulations, Section 504 of

28   the Rehabilitation Act and its implementing regulations, and California Government Code

1   § 11135.

2   4.    Issue an injunction ordering Defendants to comply with the statutes set forth in

3   this Complaint, including but not limited to ordering Defendants to:

4   a.    ensure that deaf consumers receive communication assessments to

5   identify their primary and preferred mode of communication as well as

6   effective modes of communication;

7   b.    ensure that deaf consumers receive effective communication in all I/DD

8   services;

9   c.    ensure that deaf consumers are afforded meaningful access to the I/DD

10  services program;

11  5.    Award Plaintiffs reasonable attorneys' fees, litigation expenses, and costs

12  pursuant to federal law; and

13  6.    Grant Plaintiffs such other and further relief as the Court deems to be just,

14  necessary, and equitable.

15

16  Dated: April 30, 2020              Respectfully submitted,

17                                     DISABILITY RIGHTS ADVOCATES

18
19
                                       Meredith J. Weaver
20                                     Rebecca Williford
                                       Elizabeth Ballart
21                                     2001 Center Street Fourth Floor
                                       Berkeley, CA 94704
22
23                                     DISABILITY RIGHTS CALIFORNIA

24                                     /s/ Melinda Bird
                                       Melinda Bird
25                                     William Leiner
                                       Jeanie Min
26                                     Emily Ikuta
                                       *Attorneys for Plaintiffs*
27

28

1

**ATTORNEY ATTESTATION**

2       I hereby attest, pursuant to Local Rule 5-1(i)(3), that I obtained the concurrence in the

3  filing of this document from the signatories indicated by the conformed (/s/) of Melinda Bird.

4

5                                          Meredith J. Weaver

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28